UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x
In re:                                                   :        CHAPTER 11
THE 1031 TAX GROUP, LLC                                  :        CASE NO. 07-11448 (MG)
                                                         :        Jointly Administered
                                        Debtor.          :
-----------------------------------------------------------------x
GERARD McHALE, JR., not individually but                 :
Solely in his capacity as Chapter 11 trustee for         :
THE 1031 TAX GROUP, LLC, *et al.*,                       :
                                        Plaintiff,       :
                 - against -                             :        ADV. PRO. NO.
                                                         :        08-01644 (MG)
                                                         :
SERGIO S. ALVAREZ AND MARGARET J.                        :
ALVAREZ, AS TRUSTEES OF THE                              :        **OPINION & ORDER**
ALVAREZ FAMILY TRUST**,** *et al*.,                      :        **GRANTING**
                                        Defendants.      :        **PRELIMINARY**
                                                         :        **INJUNCTION**
-----------------------------------------------------------------x

*A P P E A R A N C E S*

Jeffrey Cohen
Aaron Boschee
Cohen and Associates, P.C.
1600 Stout Street
Suite 1710
Denver, CO 80202
(303) 825-4120
*Attorneys for Defendants*

David J. Eiseman
Jonathan L. Flaxer
Dallas Albaugh
Golenbock, Eiseman, Assor & Bell
437 Madison Avenue
New York, NY 10022
(212) 907-7438
*Attorneys for the Chapter 11 Trustee*

**MARTIN GLENN,**
**United States Bankruptcy Judge**

Pending before the Court is the Chapter 11 Trustee's motion for a preliminary

injunction enjoining the state court plaintiffs ("Plaintiffs") from prosecuting three state

court actions pending in Colorado against former employees of The 1031 Tax Group,

LLC (collectively with its other affiliate entities, "the Debtors").  The three actions are

*Alvarez v. McCabe*, *Ward Enters. LLC v. McCabe*, *MSN Props. LLC v. McCabe*.  Those

cases are pending in the District of Denver, case no. 07-CV-11495 (consolidated with

case 08-CV-729) (collectively "the Colorado Lawsuits").  Specifically, the Trustee seeks

to enjoin Plaintiffs from proceeding with the state court litigation pending confirmation

of a Chapter 11 plan, because the actions threaten to undermine two settlement

agreements the Trustee has negotiated with certain of the Debtors' former employees and

also with several of its errors and omissions insurers.  Additionally, the Trustee asserts

that he is currently seeking to reach other similar settlement agreements and those efforts

will also be adversely affected by the Colorado cases.  After the Court entered a

temporary restraining order on October 24, 2008, the parties engaged in expedited

discovery.  On November 17, 2008, the Court held an evidentiary hearing and argument.

After further briefing, the Court held additional oral argument on December 4, 2008.

Based on the evidence and the arguments, the Court grants a preliminary injunction

pursuant to 11 U.S.C. § 105(a) to the extent provided herein.

## BACKGROUND

### A.    The Debtors' Business Operations and Reorganization Efforts

The background of the Debtors' business and these reorganization cases has been

addressed in prior opinions of this Court, familiarity with which is assumed.  *See, e.g., In*

*re 1031 Tax Group, LLC*, 374 B.R. 78 (Bankr. S.D.N.Y. 2007); (ECF Docs. # 279, 400,

812.) The Debtors were "qualified intermediaries," or "QIs," engaged in the business of

providing custodial services to individuals and entities conducting property exchanges

under § 1031 of the Internal Revenue Code, 26 U.S.C. § 1031.  The main purpose of a §

1031 like-kind exchange is to defer capital gains tax resulting from the sale of investment

property.  As of the Petition Date, there were over 300 open exchange contracts with the

Debtors representing an estimated liability of $151 million.

      Edward H. Okun ("Okun") is the sole member of the main Debtor, The 1031 Tax

Group, LLC, and was the sole manager or sole director of each of the Debtors at the time

the cases were filed.  Okun acquired all of the Debtor entities between August 2005 and

December 2006 with a business strategy of "rolling up" regional QIs into a national firm.

Investment Exchange Group, LLC, or IXG, was a Colorado-based QI owned by a group

of individuals known as the McCabe Group (see *infra*).  National Exchange Services QI,

or NES, was a Texas-based QI that Okun owned and the McCabe Group managed after

Okun purchased IXG in 2006.  The Plaintiffs were parties to exchange transactions in

which IXG or NES acted as QI.

      Okun, who is under indictment and awaiting trial in the Eastern District of

Virginia, diverted approximately $140 million deposited by exchange participants in

accounts controlled by the Debtors, using the funds for other investments or to maintain a

lavish lifestyle, with multiple airplanes, boats and homes.

      Initially, after a change in management, the Court denied motions to appoint a

chapter 11 trustee or to convert the case to a case under chapter 7.  *See 1031 Tax Group*,

374 B.R. at 81.  Subsequently, however, after efforts to craft a speedy exit from chapter

11 failed, the Court granted renewed motions to appoint a Chapter 11 Trustee.  (*See* ECF

Doc. #812.)  Since a Chapter 11 Trustee was appointed in this case on October 24, 2007,

the Trustee has threatened or filed lawsuits against numerous entities and individuals for

their alleged involvement in Okun's fraud.  In October 2007, Okun transferred

substantially all of his non-debtor assets to the Trustee.  The Trustee has made efforts to

consolidate and sell Okun's assets, and to reach settlements with various insurance

companies, former employees, and other entities that may face liability to the Debtors for

their alleged misconduct.  The Trustee avers that these efforts have brought in millions of

dollars into the estate and will potentially bring in millions more.

**B.      The Second Amended Stipulation and Order Approving Settlement**

In May 2007, while still operating as debtors-in-possession, the Debtors filed an

adversary proceeding seeking to resolve issues of ownership of almost $20 million

deposited by the Debtors in accounts at Colorado Capital Bank ("CCB").  (*See*

Complaint, Adv. Proc. 07-01710, ECF Doc. #1.)  All but one of the Plaintiffs in the

Colorado Lawsuits were defendants in the adversary proceeding.  (*See* ECF Doc. #754.)

All of the Plaintiffs' exchange proceeds were deposited in accounts at CCB.  The central

question in that adversary proceeding was whether the exchangers' funds that were

deposited in CCB remained the property of the exchangers on express, constructive or

resulting trust theories, or whether the funds in the CCB accounts were property of the

Debtors.  Following expedited discovery, on the eve of trial, a settlement was reached

and subsequently approved by order of the Court, which resolved the ownership of all of

the funds in the CCB accounts.  (ECF Doc. #754.)  Except for amounts paid out in the

settlement, the Court determined that all of the funds in the CCB accounts belonged to

the Debtors. (*Id.* ¶¶ 1-2.) Not all exchangers with funds deposited by Debtors in the

CCB accounts were named in or defended the adversary proceeding. Nevertheless, the

Order resolving the adversary proceeding bound all exchangers, whether known or

unknown, whose funds were deposited in the CCB accounts. (*Id.* ¶ 11.) The Order

entered by the Court expressly preserved any claims or causes of action that the

exchangers had against certain of the Debtors' employees. (*Id.* ¶¶ 2, 6.) Ownership of

the funds in the CCB accounts is relevant to whether at least some of the claims asserted

in the Colorado Lawsuits—for example, claims alleging conversion of funds in the CCB

accounts—are property of the Debtors' estates, held exclusively by the Trustee, and

subject to the automatic stay under Bankruptcy Code § 362(a).

## C.    The Colorado Lawsuits

Shortly after signing the Stipulation, numerous exchangers filed suit in Colorado

state court against, among others, a group of former employees of the Debtor referred to

collectively as the "McCabe Group."[1] The McCabe Group defendants are Daniel

McCabe, Shirley McCabe, Andrew McCabe, Chad Greenberg, J. Peter McCann, and

Richard B. Simring, who were all allegedly owners and managers of IXG. It also

includes Reverse Lending, LLC, an entity wholly owned by the McCabe Group. In 2006,

the individual members of the McCabe Group sold IXG to Okun for $9 million, and, after

the sale, continued operating IXG along with another Okun-owned QI, NES. In one

action, the Plaintiffs, referred to collectively as the "Alvarez Plaintiffs," allege that the

McCabe Group and others, failed to fund the Plaintiffs' 1031 exchanges as a result of

---

[1]    *Alvarez v. McCabe*, *Ward Enters. LLC v. McCabe*, *MSN Props. LLC v. McCabe*. Those cases are
pending in the District of Denver, case no. 07-CV-11495 (consolidated with case 08-CV-729) (collectively
"the Colorado Lawsuits").

misappropriations by Okun and others. Devorkin Aff. ¶ 37.[2]  In September 2008, several

other exchangers, collectively referred to as the "MSN Plaintiffs," filed a mirror

complaint in Colorado state court against the McCabe Group and others. Devorkin Aff. ¶

40. Finally, one other litigant, Ward Enterprises, LLC ("Ward"), filed a lawsuit against

the McCabe Group, Colorado Capital Bank, and others.[3]  The Alvarez and MSN

Plaintiffs have filed proofs of claim against the 1031 Debtors in this case. The Alvarez

and MSN Plaintiffs were also signatories to the Stipulation. Ward was not a signatory,

nor has it filed a proof of claim.

### D.      The Settlement Agreements

#### 1.      *The McCabe Group Settlement*

The Trustee reached a proposed settlement agreement with the McCabe Group

settling potential claims that each has against the other. In 2006, the McCabe Group sold

IXG to the 1031 Tax Group. Devorkin Aff. ¶ 31. That sale provided that the McCabe

Group would receive $9 million, $7 million up front, and $1 million each on of the first

and second anniversary of the closing. Devorkin Aff. ¶ 32. As part of that sale, the

members of the McCabe Group became employees of the 1031 Tax Group and all but

one executed employment agreements at that time. Devorkin Aff. ¶ 34.

When the Debtors filed for bankruptcy, the individual members of the McCabe

Group filed individual proofs of claim for unpaid wages, unreimbursed expenses, and the

---

[2]      References to "Devorkin Aff." refer to the declaration of Michael S. Devorkin attached to the Trustee's Motion for a Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction Against the Commencement or Continuation of Certain Other Actions Affecting Property Belonging to the Estates. ECF Doc. #1.

[3]      There are some minor differences between the Ward complaint and the other two complaints. Specifically, Ward alleges that it deposited exchange funds in another bank, United Western Bank, that was not a party to the Second Amended Stipulation and Order. The Ward complaint also alleges that those funds were transferred in December 2006 to CCB.

balance of the purchase price allegedly due under the sale contract. Devorkin Aff. ¶ 35.

The Trustee has negotiated a settlement with the McCabe Group over these claims, as

well as any claims the Debtors' estates may have against the McCabe Group. The

principal terms are:

- The McCabe Group will pay $1.25 million to the Estate;

- The McCabe Group waives all claims it may have to the $2 million it
  alleges it is still owed under the IXG purchase agreement;

- The McCabe Group assigns to the Trustee all rights it may have under
  certain insurance policies (as discussed *infra*); and

- The Trustee obtains Bankruptcy Court orders enjoining all third party
  litigation against the McCabe Group and, if necessary, staying all such
  litigation until a permanent injunction is obtained.

Devorkin Aff. ¶ 28; Ex. 3. The settlement agreement was signed on September 24, 2008.

*Id.*

The Trustee later amended the agreement, and carved out one entity, Reverse

Lending LLC, a company wholly owned by the McCabe Group. Ex. 1 to Devorkin Aff.

to Trustee's Supplemental Memorandum of Law in Support of Trustee's Motion for a

Preliminary Injunction Staying Certain Colorado State Court Actions. The amended

agreement provides that the McCabe Group may use up to $50,000 to defend Reverse

Lending in defense of the Colorado Lawsuits. *Id.* ¶ 3. The Trustee recently filed a

motion seeking approval of the McCabe Group Settlement. (ECF Doc. #1409, 1410.)

That motion is scheduled to be heard on February 4, 2009.

2.    *The E&O Settlements*

Certain of the Debtors have an ownership interest in five Errors & Omissions

insurance policies ("E&O Policies"). Devorkin Aff. ¶ 13. The E&O Policies provide

coverage for claims made against the Insureds for wrongful acts, excluding intentional

7

conduct.  Devorkin Aff. ¶ 14.  The total aggregate policy limit among the five policies is

$5.5 million; up to the limits, the E&O Policies will pay for (i) reasonable defense costs

incurred by any insured to defend against claims based on covered acts; and (ii) the

judgments awarded against any Insured based on covered acts.  Devorkin Aff. ¶¶ 15-16.

The policies are "wasting" policies, because payment of defense costs applies against the

limits; if defense costs exhaust the limits, the policies will not pay out any judgment.

Devorkin Aff. ¶ 16.

       The McCabe Group has claimed against the E&O Policies for payment of

attorneys' fees and costs to defend.  Devorkin Aff. ¶ 36.  Only one E&O Policy covered

IXG, with policy limits of $500,000, but the McCabe Group has nevertheless sent claim

letters asserting coverage under four separate policies.  Declaration of David  J. Eiseman

(attached to the Trustee's Reply Memorandum of Law in Further Support of the Trustee's

Motion for a Stay and Preliminary Injunction Staying Certain Colorado State Court

Actions), Ex. 9.  The Trustee contends that the claims made by the exchangers and others

are covered by the E&O Policies for the benefit of the estate, but objected to the McCabe

Group's claims as violating the automatic stay.  Devorkin Aff. ¶ 17.  The E&O Insurers

have raised numerous defenses to these claims, including that the applications were

incomplete or misleading and that the acts in questions were intentional and not covered

by the E&O Policies.  Devorkin Aff. ¶ 20.

       The Trustee believes that the costs of litigating the applicability of the E&O

Policies, as well as the costs of defending the McCabe Group, would consume most, if

not all, of the policy limits.  Therefore, the Trustee has also reached a settlement with the

E&O Insurers.  Devorkin Aff. ¶¶ 21-25.  The E&O Settlement provides for a policy buy-

back and includes, among other things:

- The Estate will receive $4.6 million from the Insurers, which represents about 84% of the total policy limits;

- The Trustee will obtain a channeling injunction against any claims made against the E&O Policies by any party.  The injunction would channel such claims to the Bankruptcy Court and would apply the claims against a limited portion of the $4.6 million settlement amount; and

- Of the funds paid to the estate, $250,000 will be segregated and held in trust to pay any claims of non-debtor insureds (the "channeling injunction").

Devorkin Aff. ¶ 26; Ex. 2.  The settlement agreement was signed on October 23, 2008.

No motion has been made as yet seeking court approval of the E&O settlement.


### E.    Ward's The Alvarez Plaintiffs' Attachment Motion

The Colorado Lawsuits have resulted in the McCabe Group filing claims for

payments under the E&O Policies.  The Trustee objected to the claims.  On September

24, 2008, Ward and the Alvarez Plaintiffs filed a motion seeking a writ of attachment or a

preliminary injunction to take control of the McCabe Group's assets.  Devorkin Aff. ¶ 46;

Ex. 8.  The motion seeks to attach more than $7 million of the McCabe Group's assets.

The filing of the attachment motion precipitated the filing of the adversary proceeding

and the request for a temporary restraining order and preliminary injunction in this case.


### F.    The Requested Relief and Proceedings

The Trustee seeks a preliminary injunction staying the Colorado Lawsuits

pending confirmation of a Chapter 11 plan.  The Trustee contends that the Colorado

Lawsuits, and in particular the writ of attachment motion, will undermine the settlements

it has negotiated with the McCabe Group and the E&O Insurers.  The Trustee also

contends that the injunction should continue through confirmation, because the Colorado actions threaten to deplete an asset of the estate, the proceeds from the E&O Policies, preventing the debtors from conducting an effective reorganization.

The Plaintiffs counter by arguing that the Court does not have jurisdiction to enjoin suits against non-debtors based on independent causes of action belonging to creditors and not to the Trustee.  Further, they argue, non-debtor releases are only permitted when they are necessary to the reorganization process.  Here, according to the Plaintiffs, the injunctions preserving the E&O Policies are not integral to the reorganization process, because: (i) the debtors are administratively insolvent, (ii) the McCabe Group will contribute minimal funds to the estate, (iii) the debtors no longer employ the McCabe Group, and so they are not necessary to the estate's administration, and (iv) the Trustee intends to liquidate the estate, and so there is no reorganization process to protect.  Finally, the Plaintiffs argue that the remedy the Trustee seeks is inappropriate.  Rather, the Trustee could seek an injunction against the McCabe Group from making claims against the E&O Policies.  For all of these reasons, the Plaintiffs argued that the preliminary injunction the Trustee seeks is inappropriate.

At oral argument, the Court noted that neither party adequately addressed the question whether the automatic stay applies to any of the claims in the Colorado Lawsuits.  The Court therefore directed the parties to brief which claims, if any, are direct and belong to the Plaintiffs, and which are derivative, belong to the Trustee, and are subject to the automatic stay.  The parties submitted supplemental briefs on this and other issues, followed by further oral argument.  The TRO expires by its terms at 5:00 p.m., December 10, 2008, necessitating this ruling before that date and time.

## DISCUSSION

### A.    Effect of the Second Amended Stipulation and Order Approving Settlement on the Plaintiffs' Claims

The first thing the Court must determine is whether the Court's earlier Order that the funds in CCB (except for amounts paid in settlement) were Debtors' property. The Order so provided. No appeal was taken from the Order. The Plaintiffs cannot now challenge that determination, in this Court or in the Colorado state court.

The Plaintiffs argue that the Order only prevents them from arguing in this Court that the funds in the CCB accounts belonged to the Plaintiffs. They contend that they are free to argue in the Colorado state court that the funds belonged to them. The argument is without merit. This Court clearly had jurisdiction to resolve the issue of the ownership of the funds and did so in connection with the Debtors' adversary proceeding. Indeed, the Colorado state court, in an interpleader action filed by CCB concerning precisely the same funds and the same ownership issue, determined that this Court rather than the Colorado state court was the proper forum to resolve the ownership of the funds.

Furthermore, the Plaintiffs waived their ownership claims as a result of the stipulation that resulted in their receiving substantial settlement payments, expressly waiving the right to funds deposited at CCB. Money deposited in the CCB accounts may have been wrongly diverted by Okun, with or without the assistance, agreement or other wrongful conduct of the McCabe Group, but the funds in the CCB accounts were the Debtors' funds, not the Plaintiffs, and as explained below, any claims based on taking those funds belongs to the Trustee.

The Plaintiffs argue that the express reservation of their claims against Okun and the McCabe Group in the settlement permits them to assert claims based on the

11

exchangers' alleged ownership of the funds.  The reservation of rights preserved claims;
it did not create them where none exists.  Claims that depend on the Plaintiffs' ownership
of the funds—an issue resolved in the Order in the adversary proceeding—cannot be
asserted in any Court.

### B.    Does the Automatic Stay Apply to the Colorado Lawsuits?

#### 1.    Introduction

The trustee stands in the shoes of the debtor, and may bring any suit that the
debtor could have brought before bankruptcy.  *In re Granite Partners, L.P.*, 194 B.R.
318, 323-24 (Bankr. S.D.N.Y. 1996) (citing *Hirsch v. Arthur Andersen & Co.*, 72 F.3d
1085, 1093 (2d Cir. 1995)).  Under § 544(a) of the Bankruptcy Code, the trustee also
stands in the shoes of creditors, and grants the trustee the status of a hypothetical
judgment lien creditor as of the petition date.  11 U.S.C. § 544(a).  "Section 544,
however, does not extend beyond avoidance actions, and does not permit the trustee to
assert the personal, direct claims of creditors for the benefit of the estate or for a
particular class of creditors."  *Granite Partners*, 194 B.R. at 324 (citing *Shearson
Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118 (2d Cir. 1991)); *Hirsch v. Arthur
Andersen & Co.*, 72 F.3d 1085, 1093 (2d Cir. 1995).

The Court looks to state law to determine which claims are direct and belong to
creditors, and which claims are derivative and belong exclusively to the trustee.  *In re
Johns-Manville Corp.*, 517 F.3d 52, 63 (2d Cir. 2008); *In re Ionosphere Clubs, Inc.*, 17
F.3d 600, 604 (2d Cir. 1994); *Granite Partners*, 194 B.R. at 324; *In re Keene Corp.*, 164
B.R. 844, 849 (Bankr. S.D.N.Y. 1994).  In this case, the parties agree that Colorado law
governs.

"If the cause of action belongs to the estate, the trustee has exclusive standing to assert it; conversely, if the cause of action belongs solely to the . . . creditors, the trustee has no standing to assert it." *Granite Partners*, 194 B.R. at 324-25. "When the trustee has standing to sue, the automatic stay prevents creditors or shareholders from asserting the claim notwithstanding that outside of bankruptcy, they have a right to do so." *Id.* at 325; *Keene*, 164 B.R. at 851-52.

To determine standing, the Court must look to the underlying wrongs as pleaded in the complaint and whether the plaintiff alleges a particularized injury. *Johns-Manville*, 517 F.3d at 63; *Granite Partners*, 194 B.R. at 325 ("To determine standing, the court must look to the nature of the wrongs alleged in the complaint without regard to the plaintiff's designation, and the nature of the injury for which relief is sought.") (citations omitted). The Court therefore only looks to the allegations as they are stated in the complaint, not as they are characterized in the plaintiffs' motion before this Court. *Granite Partners*, 194 B.R. at 325-26; *Apostolou v. Fisher*, 188 B.R. 958 (N.D. Ill. 1995). The Court also does not pass on the legal sufficiency of the claims. *Granite Partners*, 194 B.R. at 326. Finally, if the Court does rule that the Trustee lacks standing to bring a particular claim or cause of action, it does not necessarily mean that the Plaintiffs do. *Id.*

    2.    *The Complaint*

    a.    <u>The Complaint's Allegations</u>[4]

The Complaint asserts 25 causes of action against the McCabe Group. The claims can be grouped as follows:

---

[4] The three complaints in the Colorado Lawsuits largely mirror one another. All citations that follow are to the First Amended Complaint and Jury Demand in the Alvarez case, because that was the parties' focus in their briefs. The Alvarez Complaint is attached as Exhibit 5 to the Devorkin Affirmation.

- Claims based on the McCabe Group's violations of the Colorado Consumer Protection Act. COLO. REV. STAT. § 6-1-101 *et seq.* (causes of action 3-5)

- Claims based on the McCabe Group's negligence and breach of fiduciary duties (causes of action 6-8, 16)

- Claims based on the McCabe Group's fraudulent and negligent misrepresentations and nondisclosures (causes of action 9-15)

- Claims based on the McCabe Group's conspiring and aiding and abetting Okun's, IXG's, and NES's misconduct (causes of action 1-2, 17-25)

The 25 causes of action, in turn, comprise four types of wrongful misconduct on the part of the McCabe Group. First, the McCabe Group issued fraudulent press releases, newsletters, and brochures touting their experience and trustworthiness to induce exchangers to employ the Debtors as QIs. Second, the McCabe Group falsely misrepresented to the plaintiffs in letters and other documents that their funds would be held in trust. Third, the McCabe Group falsely misrepresented that the Debtors only obtained legal title to the funds, and that equitable title would remain with the exchangers. And finally, the complaint alleges that the McCabe Group aided Okun's conversion of the exchangers' funds and failed to disclose to exchangers what had become of their funds.

   b. <u>Claims based on the McCabe Group's violations of the Colorado Consumer Protection Act</u>

The  Court concludes that the claims based on the McCabe Group's violation of the Colorado Consumer Protection Act, COLO. REV. STAT. § 6-1-101 *et seq.* (the "CCPA"), are direct and belong to the Plaintiffs and not to the Trustee. The Court finds that the complaint adequately alleges the actual deceptive practices engaged in by the McCabe Group directed specifically at the Plaintiffs. Complaint ¶¶ 26, 27, 60. The Trustee asserts weakly that these claims should be stayed because it could lead to liability

14

to the Debtors under *respondeat superior* or indemnification.  But that does not address the question of whether the Trustee has standing to sue.  As the Trustee conceded at oral argument, the question of whether the CCPA claims should be stayed because the state court litigation could expose the debtor to *respondeat superior* or indemnification liability is properly considered in the context of a § 105(a) injunction; the Court will take up that question in that context.  Therefore, causes of action 3, 4 and 5 are all direct claims belonging to the Plaintiffs and not to the Trustee, and are not subject to the automatic stay.

                c.      <u>Claims based on the McCabe Group's negligence and breach of fiduciary duties</u>

The Court concludes that the Plaintiffs' negligence and fiduciary breach claims, as alleged in the Complaint, are derivative in nature and belong to the Trustee.[5]  In general, fiduciary breach claims ordinarily belong to the corporation and are enforced through shareholder derivative actions.  *See Granite Partners*, 194 B.R. at 327.  This case is no different:  as alleged in the complaint, the negligence and fiduciary breach claims are based on the McCabe Group's employment by the Debtors, allege generalized injuries to all creditors, not just to the Plaintiffs, and so are derivative in nature.

The Court finds the Tenth Circuit's analysis and application of Colorado law in *Delgado Oil Co., Inc. v. Torres*, 785 F.2d 857 (10th Cir. 1986), persuasive here.  In *Delgado*, Delgado Oil Company, a creditor of debtor Balducci, claimed it could maintain its suit against an individual director of Balducci because the claim was based on Colorado law that allowed creditors to sue directors for breaching the duty not to divest an insolvent corporation's property for a director's benefit.  The Tenth Circuit rejected

---

[5]       The negligence allegations appear to be based on the same duties as the fiduciary breach allegations, and so the Court treats them together.  Complaint ¶¶ 126-29.

that argument and dismissed the case, because the director's liability for violating a
fiduciary relationship was "thrust upon him solely because of his capacity as a director of
an insolvent corporation indebted to the plaintiff.  Of greater consequence, this trust
relationship applied to all the creditors of Balducci, not just this plaintiff."  *Id*. at 861.
Therefore, the Tenth Circuit ruled that the claim was derivative, belonged to the trustee,
and should be dismissed.  *Id.* at 862.

Here too, to the extent the complaint alleges that the McCabe Group owed
fiduciary obligations to the Plaintiffs, those obligations were similarly "thrust upon
[them] solely because of [their] capacity as" employees of the Debtors.  *Id.* at 861.  The
complaint alleges that the McCabe Group owed the Plaintiffs the "duty to safeguard the
funds entrusted to them, and to refrain from transferring, or otherwise relinquishing
control over, Plaintiffs' funds for any purpose other than to close on the purchase of
Plaintiffs' replacement properties, to properly account for Plaintiffs' funds, and to defend
Plaintiffs' funds from improper disbursement."  Complaint ¶ 75.  Taken as true, these are
generalized duties that the McCabe Group owed to all exchangers, not just the Plaintiffs.
Indeed, these fiduciary obligations make no sense without reference to the McCabe
Group's employment by the Debtors and a general duty that the McCabe Group owed to
all exchangers.  It is telling that the allegations regarding the scope of the McCabe
Group's fiduciary obligations are identical to the allegations regarding the scope of IXG's
and NES's—two of the Debtor entities—obligations. *Compare* Complaint ¶ 75 *with*
Complaint ¶ 144.

The Plaintiffs argue that their fiduciary breach claims are direct, because the
fiduciary obligations owed to them by the McCabe Group did not arise in the corporate

context, but either by way of (i) operation of law, (ii) the high degree of control the

McCabe Group exercised over the Plaintiffs' accounts, or (iii) the confidential nature of

the relationship between the McCabe Group and the Plaintiffs.  And indeed that may be

so; the Court does not pass on the legal sufficiency of these arguments.  But the

complaint is completely devoid of any allegations supporting the existence of such

fiduciary relationships.  The Court is constrained to look at the allegations as they are

alleged in the complaint, not as the Plaintiffs describe them in their motion papers before

this Court.  *See Granite Partners*, 194 B.R. at 325-26.  The Court also cannot "credit

conclusory allegations that are belied by more specific allegations" in the complaint.  *Id.*

at 326.  As explained above, the fiduciary obligations as alleged in the complaint stem

exclusively from the McCabe Group's positions with the Debtors and so are derivative in

nature.  Therefore, causes of action 6, 7, 8 and 16 are property of the estate pursuant to

Bankruptcy Code § 541 and are subject to the automatic stay under Bankruptcy Code

§ 362(a)(3).  *Granite Partners*, 194 B.R. at 325.

> d.    Claims based on the McCabe Group's fraudulent and negligent
>       misrepresentations and nondisclosures

The Court concludes that the claims based on the McCabe Group's fraudulent and

negligent misrepresentations and nondisclosures are direct and may be asserted by

creditors without violating the automatic stay.  *See Granite Partners*, 194 B.R. at 327

(holding that fraudulent inducement claims against debtor's management were direct and

belonged to shareholders, not the trustee).  In Colorado, claims for both fraudulent

misrepresentation and concealment require a material misrepresentation, justifiable

reliance, and damages.  *Williams v. Boyle*, 72 P.3d 392, 399-400 (Colo. Ct. App. 2003).

The two principal, although not exclusive, fraud claims alleged here are that the McCabe

Group misrepresented to the Plaintiffs that their money would be held in a trust account

and that the McCabe Group concealed and failed to disclose that IXG and NES were

transferring money from the exchanger accounts to third-party bank accounts over which

the McCabe Group had no control.  Complaint ¶¶ 88, 101.  These claims allege injuries

particularized to the Plaintiffs.  *See First Horizon Merchant Servs., Inc. v. Wellspring*

*Capital Mgmt., LLC*, 166 P.3d 166, 182 (Colo. Ct. App. 2006) (holding that a creditor has

standing to bring fraud claims where defendants' misrepresentations in letters and phone

conferences directly injured plaintiffs).  Therefore, causes of action 9, 10, 11, 12, 13, 14

and 15 are all direct claims belonging to the Plaintiffs and not to the Trustee, and are not

subject to the automatic stay.

e.    <u>Claims based on the McCabe Group's conspiring and aiding and
abetting Okun's, IXG's and NES's misconduct</u>

Under Colorado law, conspiracy and aiding and abetting are independent torts that

arise from the acts of the party upon whom liability is imposed.  *See Double Oak Constr.*

*LLC v. Cornerstone Dev. Int'l LLC*, 97 P.3d 140, 148 (Colo. Ct. App. 2003) ("Civil

conspiracy is an independent tort, and a claim for damages arising from a civil conspiracy

may be pled as a separate claim.") (citations omitted); *Holmes v. Young*, 885 P.2d 305,

308 (Colo. Ct. App. 1994) ("Aiding and abetting a tortious act will be found if the party

whom the defendant aids performs a wrongful act that causes an injury, the defendant is

generally aware of his role as part of an overall illegal or tortious activity at the time that

he provides the assistance, and the defendant knowingly and substantially assists in the

principal violation.").  The Court therefore must look to the underlying wrongs to

determine whether the injuries the Plaintiffs allege they have suffered are direct or

indirect.  *See In re Johns-Manville Corp.*, 517 F.3d 52, 63 (2d Cir. 2008).  With the

18

exception of causes of action 1 and 2, the aiding and abetting and conspiracy claims track

the fiduciary breach and fraud claims against the individual members of the McCabe

Group personally, so the Court's analysis above with respect to those claims applies with

equal force here.  Therefore, causes of action 17, 18, 21, 22, 23, 24, and 25 are direct

claims that the Plaintiffs may assert without violating the automatic stay, and causes of

action 19 and 20 are derivative claims that may only be asserted by the Trustee.

That leaves the first two causes action, conspiracy and aiding and abetting Okun's

conversion.  The Court concludes these claims are derivative and belong to the Trustee.

First of all, as explained above, the Second Amended Stipulation and Order already

decided that the funds deposited in CCB belonged to the Debtors and not to the

exchangers, a determination that cannot be collaterally attacked in the Colorado

Lawsuits.  Furthermore, the Court concludes that the Plaintiffs have waived any right to

bring this claim by signing the Stipulation.  The gravamen of the conversion claims is the

presence of funds in certain bank accounts allegedly belonging to the Plaintiffs and other

exchangers.  Complaint ¶¶ 49-50.  Because the Stipulation and Order provide that these

funds were property of the estate, the Plaintiffs cannot meet the required elements of a

conversion claim, requiring that Plaintiffs identify specific funds to which it is entitled.

*See Rhino Funds LLLP v. Hutchins*, --- P.3d ---, 2008 WL 2522308, at *9 (Colo. Ct. App.

June 26, 2008) ("An action will lie for conversion the conversion of money where there is

an obligation to return or otherwise particularly treat *specific money*.") (emphasis added).

In addition, the injury the Plaintiffs suffered is generalized to all creditors.  Again,

the Court must look at the allegations as they are pled in the complaint, not as they are

described in the motion papers.  *Granite Partners*, 194 B.R. at 325.  Contrary to the

Plaintiffs' allegations in their motion that the conversion claims are based on the McCabe

Group's misrepresentations to the Plaintiffs, the claims as they are alleged in the

complaint are undoubtedly based on Okun's looting.  Complaint ¶¶ 50-51, 56-57.  There

is no allegation that Okun looted only these plaintiffs' exchange funds, or that his looting

was specifically directed towards them, or that the McCabe Group did the looting.

Indeed, the complaint concedes that Okun's theft was "accomplished by Okun's

withdrawing funds from bank accounts containing Plaintiffs' *and other exchangers'*

*funds*."  Complaint ¶ 50 (emphasis added).  This is an allegation of a generalized injury to

all creditors, and so the cause of action rightfully belongs to the Trustee.

The Plaintiffs assert that the Trustee does not have standing to bring claims based

on Okun's looting because of the Second Circuit's decision in *Hirsch v. Arthur Andersen*

*& Co.*, 72 F.3d 1085 (2d Cir. 1995).  *Hirsch* held that only defrauded investors in a Ponzi

scheme, and not the chapter 11 trustee, had standing to bring fraud, negligence, and

fiduciary breach claims against the debtor's employees.  *Id.* at 1093.  The Plaintiffs'

reliance on *Hirsch* is misplaced for two reasons.  First, the plaintiffs in *Hirsch* did not

assert conversion claims, so *Hirsch*'s analysis is inapt to claims based on Okun's looting.

*Id.* at 1092.  And second, *Hirsch* relies on Connecticut law, which is inapplicable here.

The Plaintiffs do not point to any Colorado law that finds that only creditors may assert

claims based on the general looting of bank accounts.

Therefore, causes of action 17, 18, 21, 22, 23, 24 and 25 belong to the Plaintiffs

and are not subject to the automatic stay.  Causes of action 1, 2, 19 and 20 belong

exclusively to the Trustee, are property of the estate, and are subject to the automatic stay

under Bankruptcy Code § 362(a)(3).

*      *      *

The Court's conclusions about which claims are direct and which are derivative does not end the inquiry.  The Court must also decide whether a preliminary injunction pursuant to § 105(a) is warranted in this case to aid the reorganization process.  For the reasons explained below, the Court concludes that a preliminary injunction for a period of 90 days—subject to possible extension based on an application to extend the period— is warranted in this case to permit the Court time to consider the McCabe Group Settlement, any other settlements, which is scheduled to be heard on February 4, 2009, and a disclosure statement and plan.

### C.    The Colorado Lawsuits Should Be Stayed Under § 105(a) to Aid the Court's Jurisdiction and to Aid the Reorganization Process

The Court concludes in any event that all of the claims should be preliminarily enjoined under §105(a) until the Court considers the McCabe Group Settlement for approval under FED. R. BANKR. P. 9019.

Section 105 authorizes the court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Section 105 authorizes a bankruptcy court to exercise power outside the bounds of the automatic stay.  Because § 105(a) injunctions are authorized by statute, they do not need to comply with the traditional requirements of FED. R. CIV. P. 65.  *In re Ionosphere Clubs, Inc.*, 111 B.R. 423, 431 (Bankr. S.D.N.Y. 1990); *In re Neuman*, 71 B.R. 567, 571 (S.D.N.Y. 1987).  Rather, "the bankruptcy court may enjoin proceedings in other courts when it is satisfied that such a proceeding would defeat or impair its jurisdiction with respect to a case before it."  *In re Johns-Manville Corp.*, 91 B.R. 225, 228 (Bankr. S.D.N.Y. 1988); *In re Keene Corp.*, 164 B.R. 844, 849 (Bankr. S.D.N.Y. 1994); *In re AP*

*Indus., Inc.*, 117 B.R. 789, 802 (Bankr. S.D.N.Y. 1990); *In re Ionosphere Clubs, Inc.*, 111

B.R. 423, 434 (Bankr. S.D.N.Y. 1990).

To enjoin claims against non-debtors under § 105(a), a bankruptcy court must

find that the claims "threaten to thwart or frustrate the debtor's reorganization efforts,"

*Granite Partners*, 194 B.R. at 337, and that the injunction is "important" for effective

reorganization.  *See In re Johns-Manville Corp.*, 837 F.2d 89, 93-94 (2d Cir. 1988); *In re*

*Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 293 (2d Cir. 1992); *In re A.H.*

*Robins Co.*, 880 F.2d 694, 701 (4th Cir. 1989); *see also In re Calpine Corp.*, 365 B.R.

401, 410 (S.D.N.Y. 2007) (affirming § 105(a) injunction because state court litigation

against non-debtors threatened debtor's reorganization efforts).  In addition, "the courts

have recognized that a stay should be provided to codefendants when the claims against

them and the claims against the debtor are 'inextricably interwoven, presenting common

questions of law and fact, which can be resolved in one proceeding.'"  *In re Ionosphere*

*Clubs, Inc.*, 111 B.R. 423, 434 (Bankr. S.D.N.Y. 1990) (citing *Fed. Life. Ins. Co. v. First*

*Fin. Group, Inc.*, 3 B.R. 375, 376 (S.D. Tex. 1980)).

Judge Bernstein in *Granite Partners* identified the factors a court should consider

in issuing a § 105 injunction to stay actions against non-debtors.  Relying on *Manville*

and *Robins*, the court noted that a court should consider, among other relevant factors,

whether the suits would (i) threaten the debtor's insurance coverage, (ii) increase the

debtor's indemnification liability, (iii) result in inconsistent judgments, (iv) expose the

debtor to risks of collateral estoppel or *res judicata*, and (v) burden and distract the

debtor's management by diverting its manpower from reorganization to defending

litigation.  *Granite Partners*, 194 B.R. at 337.  The Court finds that while not all of these

risks are present here—in particular, because the McCabe Group is not management, the risk of management being distracted by the Colorado Lawsuits is minimal—the Trustee has presented sufficient evidence that an injunction is warranted here.

First, the Court finds that the Trustee has presented evidence that the Debtors face a very real possibility that insurance proceeds would be at risk if the Colorado Lawsuits are permitted to continue. The evidence presented established that the McCabe Group has already claimed against the E&O Policies, policies whose proceeds are assets of the estate. If the Colorado Lawsuits go forward, insurance proceeds recoverable by the estate from these wasting policies may be diminished by defense costs of the McCabe Group. Further, there is a risk that evidence adduced in the Colorado Lawsuits threatens the estate's coverage under the E&O Policies and other crime-fraud insurance policies that are property of the estates. The process of discovery could yield evidence that the E&O Insurers and other insurers may use against the Debtors' estates.[6]

Second, the Court finds that there is a substantial risk that the Debtors face liability for indemnification if the Colorado Lawsuits are permitted to continue. The Plaintiffs argue that there is no such risk here, because Colorado's comparative negligence statute specifically states that liability imputed to a non-party has no presumptive or conclusive effect in a subsequent action against that non-party. COLO. REV. STAT. § 13-21-111.5(3)(a); *see also Watters v. Pelican Int'l, Inc.*, 706 F. Supp. 1452, 1456 (D. Colo. 1989). While the Court accepts this assertion as true, reliance on the comparative negligence statute does not address the entire risk the estates face. The Trustee conceded that since the Debtors are not parties to the Colorado Lawsuits they

---

[6]     Certain insurers have filed a motion to lift the automatic stay to permit them to rescind the Debtors' crime-fraud insurance policies on grounds of fraud. (*See* ECF Doc. #1338.)

face no risk of *res judicata* or collateral estoppel.  Nevertheless, if the McCabe Group is

found liable, particularly on the negligence claim, they may have a claim for

indemnification against the Debtors.

Third, McCabe Group liability in the Colorado Lawsuits could lead to *respondeat

superior* liability for the Debtors here; the Plaintiffs' counsel's representation in court

that he would not pursue such claims is cold comfort for the estates.  In short, the risk that

the Colorado Lawsuits could lead to additional liability for the estates before the McCabe

Settlement is considered for approval is sufficiently significant to warrant a preliminary

injunction under § 105(a).

Lastly, the Court concludes that the overlap between the allegations underlying

the Colorado Lawsuits and the conduct the McCabe Group Settlement purports to resolve

also supports a § 105(a) injunction.  The Trustee argues that the Second Circuit's

decision in *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096 (2d Cir. 1988), dictates this

result.  While the Court concludes that the overlap between the Colorado Lawsuits and

the McCabe Group Settlement supports a § 105(a) injunction, the Court does not read

*Bankers Trust* as expansively as the Trustee would have it.  In *Bankers Trust*, the Second

Circuit found that a defrauded creditor had standing independent of the trustee to bring a

RICO fraud claim against the debtor's former officers.  *Id.* at 1101.  The court in *dicta*,

however, recognized an overlap between the creditors' claims and the trustee claims

because the creditor was injured by identical transactions that injured the debtor.  *Id.* at

1106.  Therefore, to the extent that the trustee could recover for the debtor's injury, the

creditor's injury would be correspondingly reduced.  *Id*.  The Second Circuit therefore

held that the RICO claims had not yet accrued and ruled that Bankers Trust would have

four years after receiving a distribution from the estate to bring its claim. *Id.* Notably, however, *Bankers Trust* involved questions of standing, accrual of RICO claims, and statutes of limitations for such RICO claims; it did not involve the issuance of an injunction or the question of a bankruptcy court's jurisdiction under § 105(a). Contrary to the Trustee's argument, the Court therefore concludes that *Bankers Trust* does not, by itself, *require* the issuance of an injunction where creditors assert direct claims based on conduct that happens to overlap with claims that belong to the Trustee.

Under the Seventh Circuit's decision in *Fisher v. Apostolou*, 155 F.3d 876 (7th Cir. 1998), however, the Court does conclude that it should consider this overlap as one factor weighing in favor of issuing a preliminary injunction under § 105(a). In *Apostolou*, the Seventh Circuit reinstated a § 105(a) injunction enjoining securities, commodities, and common law fraud claims by defrauded creditors against a clearing house that had participated in debtor's Ponzi scheme. The court found that the claims, although not "property of" the debtor's estate, were "related to" the estate because there were "claims to the same limited pool of money, in possession of the same defendants, as a result of the same acts, performed by the same individuals, as part of the same conspiracy." *Id.* at 882. The court reasoned that the overlap between the creditors' claims and the trustee's claims would create a "race to the courthouse" that would impede reorganization. *Id.* at 883. Accordingly, the court stayed the investors' claims pending the outcome of the trustee's claims. *Id.*

*Apostolou* supports an injunction under § 105(a) under the facts presented here. The primary fraud claims in the Colorado Lawsuits allege that the McCabe Group misrepresented that the Plaintiffs' money would be held in a trust account and that the

McCabe Group concealed and failed to disclose, among other things, that they were transferring this money to third-party bank accounts over which the McCabe Group had no control.  Complaint ¶¶ 88, 101.  Like the *Apostolou* creditors' claims, the Plaintiffs' claims and the Trustee's claims are "closely related."  They also arise from the same alleged course of conduct by the McCabe Group:  the misrepresentation was made on IXG letters that were sent to all exchangers, not just the Plaintiffs.  Permitting the Colorado Lawsuits to proceed before the Trustee has had the opportunity to resolve the issues in connection with the proposed McCabe Group Settlement could therefore jeopardize the reorganization process.  *See In re Ionosphere Clubs, Inc.*, 111 B.R. 423, 434 (Bankr. S.D.N.Y. 1990) (holding that "the courts have recognized that a stay should be provided to codefendants when the claims against them and the claims against the debtor are inextricably interwoven, presenting common questions of law and fact, which can be resolved in one proceeding.") (citations omitted).

Accordingly, the Court finds that a § 105(a) injunction is appropriate, at least in the circumstances here where the Trustee has already presented the McCabe Group Settlement for Court approval.  The Trustee has also represented that he intends to propose a liquidation plan within the next several months.  *Granite Partners*, 194 B.R. at 338 (one factor supporting denial of injunction was trustee's delay in filing plan, commencing lawsuits against claimants, or reaching consensual agreements with claimants).  The Court, therefore, concludes that the Plaintiffs shall be enjoined from prosecuting the Colorado Lawsuits for a period of 90 days, subject to possible extension for good cause shown by the Trustee.

###### D.    The Court Need Not Address the Merits of the McCabe Group Settlement at this Juncture

Lastly, the Plaintiffs argue that the Court should not issue a preliminary injunction because it cannot approve the McCabe Group Settlement in its current form, because the Court lacks jurisdiction to permanently release or enjoin direct claims, a requirement of the McCabe Group Settlement in its current form.  The Court finds that it is not necessary to reach that issue, because it is not approving the McCabe Group Settlement today.  As often happens, and has already happened with the McCabe Group Settlement and in the related Investment Properties of America cases, settlements initially reached may be altered to overcome objections to approval.  (*See* Case No. 07-13621, ECF Doc. #245.)  It is clear that the Court may stay the Colorado Lawsuits for now, and that is all it is doing.

The Court does recognize, however, that the McCabe Group Settlement as presently structured may present insurmountable obstacles to the Trustee.  In particular, the agreement contains a condition subsequent that requires the Trustee to obtain within one year of approval of the settlement a permanent injunction against all claims—direct and derivative—against the individual members of the McCabe Group and McCabe Family, LLLP, a wholly-owned entity, arising out of their relationship with any of the 1031 Debtors.  Cases make clear that the bankruptcy courts in this Circuit have very limited power to approve settlements or chapter 11 plans containing permanent or channeling injunctions in favor of non-debtors.  *See In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 141 (2d Cir. 2005) (holding that a nondebtor release is "a device that lends itself to abuse" by operating as a bankruptcy discharge without the safeguards of the Bankruptcy Code and so is rarely proper); *In re Adelphia Commcn's Corp.*, 364 B.R. 518, 529 (Bankr. S.D.N.Y. 2007) (holding that third-party releases "are now proper only

27

in rare cases under circumstances that may be characterized as unique") (citing

*Metromedia*, 417 F.3d at 142).  But decision on these questions will have to await future

developments.

## CONCLUSION

The Court concludes that causes of action 1, 2, 6, 7, 8, 16, 19 and 20 are

derivative claims that belong to the estate and are subject to the automatic stay under §

362(a)(3).

The Court further concludes that the Trustee has satisfied his burden of presenting

evidence that the Colorado Lawsuits threaten the reorganization efforts of the Debtor

estates.  The Court declines, however, to issue an injunction for as long as the Trustee

requests, which has been something of a moving target in these proceedings.  The Trustee

in its moving papers requested a preliminary injunction through confirmation, which it

said would occur within the year.  At oral argument the Trustee modified this request by

representing that he intended to request approval of the McCabe Group Settlement within

two to three weeks.  In its supplemental papers, the Trustee requested an injunction for

120 days, because it intended to seek approval at the time a proposed Chapter 11 plan is

filed.  Most recently, the Trustee submitted the McCabe Group Settlement for approval

with a hearing date on February 4, 2009, although he has not altered his request for a

120-day injunction.

//

//

//

//

IT IS HEREBY ORDERED that all of the parties in all of the Colorado Lawsuits are hereby stayed and enjoined from litigating, prosecuting, defending, or furthering any claims or defenses in any of the Colorado Lawsuits for a period of 90 days from the entry of this order.

**IT IS SO ORDERED.**

Dated: December 10, 2008
New York, New York

                                        **/s/Martin Glenn**
                                        MARTIN GLENN
                                        United States Bankruptcy Judge